NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

―――――――――――

**NATALIE GREEN,**
*Petitioner*

**v.**

**OFFICE OF PERSONNEL MANAGEMENT,**
*Respondent*

―――――――――――

2019-2376

―――――――――――

Petition for review of the Merit Systems Protection Board in No. CH-0845-18-0576-I-1.

―――――――――――

Decided: July 27, 2020

―――――――――――

NATALIE GREEN, Maywood, IL, pro se.

SONIA MARIE ORFIELD, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for respondent. Also represented by ETHAN P. DAVIS, REGINALD THOMAS BLADES, JR., ROBERT EDWARD KIRSCHMAN, JR.; ROXANN SAMANTHA JOHNSON, Office of General Counsel, United States Office of Personnel Management, Washington, DC.

―――――――――――

PER CURIAM.

Natalie Green petitions for review of a Merit Systems Protection Board ("Board") decision that affirmed an Office of Personnel Management ("OPM") decision terminating Ms. Green's disability annuity payments and finding that she owed the government for overpayments she received after the termination's effective date.  We affirm.

## I

## A

In May 2003, Ms. Green retired on disability under the Federal Employees' Retirement System ("FERS") from a position as a Machine Operator with the U.S. Postal Service.

In 2016, Ms. Green worked as a paralegal for a federal service contractor.  She was under the age of 60 throughout 2016.  Under 5 U.S.C. § 8455(a)(2), if a person receiving a FERS disability annuity has his or her "earning capacity" restored before turning 60, payment of the annuity terminates after the end of the calendar year in which earning capacity was restored.  *See* 5 C.F.R. § 844.402(a) (setting the termination date at June 30 following that calendar year).  Earning capacity is deemed restored "if in any calendar year the income of the annuitant from wages or self-employment or both equals at least 80 percent of the current rate of pay of the position occupied immediately before retirement."  5 U.S.C. § 8455(a)(2); *see* 5 C.F.R. § 844.402 (implementing regulation).

On January 23, 2018, OPM sent Ms. Green a letter stating that her 2016 earned income indicated that her earning capacity may have been restored, and therefore her disability annuity payments might be terminated (along with her federal employee health benefits).  SApp'x

75–76.[1] OPM noted that the 2016 rate of basic pay for the position she occupied immediately before retirement was $58,231 (80 percent of which was $46,584). SApp'x 75. OPM also noted that the Social Security Administration had reported to OPM that Ms. Green's earned income for 2016 was $48,955, which exceeded that 80 percent limitation. *Id.* (citing 5 C.F.R. § 844.402).

OPM sent additional correspondence to Ms. Green, including an April 17, 2018 letter stating that she owed $12,664.22 for overpayments she received, and an April 19, 2018 letter stating that her disability annuity terminated effective June 30, 2017, and that her federal employee health benefit enrollment must also be terminated. OPM ultimately issued a final decision on August 16, 2018, reiterating its previous conclusions that: (1) Ms. Green's 2016 earned income exceeded the relevant 80 percent limitation, thus causing her disability annuity to terminate effective July 1, 2017; and (2) Ms. Green owed the government $12,664.22 from overpayments she received while the annuity should have been terminated.[2] SApp'x 39–42.

B

Ms. Green appealed OPM's final decision to the Board. An administrative judge ("AJ") issued an initial decision affirming OPM. The AJ noted that it was undisputed that (1) Ms. Green reported her 2016 income to the IRS as $48,955; (2) the 2016 base salary for the position she occupied immediately before retirement was $58,231; and

---

[1]    Citations to "App'x" and "SApp'x" refer to Petitioner Ms. Green's Appendix and Respondent OPM's Supplemental Appendix, respectively.

[2]    Although OPM's final decision set forth the effective date of termination as July 1, 2017 (as opposed to the previously communicated June 30, 2017 date), OPM's calculation of what Ms. Green owed remained at $12,664.22.

(3) the $48,955 she reported to the IRS exceeded 80 percent of that base salary, which was $46,584.80.  SApp'x 6.

Ms. Green argued that her $48,955 reported income should be reduced by the amount of health-and-welfare benefit payments she received from her employer, which would leave her with a 2016 earned income of $43,942.19—below the 80 percent limitation.[3]  SApp'x 6.  The AJ noted Ms. Green's statement that her employer paid her a rate of $21.05 per hour, plus a health-and-welfare benefit rate of $4.02 per hour.  SApp'x 7; *see* App'x 97.  The AJ further observed that, while normally these health-and-welfare benefit payments would be reduced by the cost of any actual benefits elected by the employee or provided by the employer, Ms. Green "did not elect to receive any benefit from [her employer] because she was receiving health and welfare benefits from OPM."  SApp'x 7; *see* App'x 97.

In considering Ms. Green's argument that the health-and-welfare benefit payments she received from her employer should be deducted from her income for purposes of determining her earning capacity, the AJ initially noted that OPM's relevant implementing regulation, 5 C.F.R. § 844.402, "does not define 'earning capacity' beyond stating that it is demonstrated by an annuitant's ability to earn post-retirement income in exchange for personal services or work product."  SApp'x 7.

The AJ then referred to the analogous disability-annuity regulation for the Civil Service Retirement System ("CSRS"), which she found instructive.  That CSRS regulation generally excludes "[m]edical or hospitalization health benefit plans" from the calculation of earning capacity, but

---

[3]    The AJ noted that Ms. Green's federal service contractor employer was obligated to provide this benefit or the cash equivalent thereof.  SApp'x 6–7 (citing 41 U.S.C. § 6703(2)).

not if "the employee had the opportunity (whether exercised or not) to elect to receive the cash value . . . of the employer-provided amount or service." *See* 5 C.F.R. § 831.1209(d)(3)(ii), (d)(4)(ii); *see also* SApp'x 7–8. The AJ reasoned that, under this regulation, although an employer's payments to a healthcare provider might not constitute income, payments made to the employee in lieu of healthcare coverage would. SApp'x 8. Finding that Ms. Green had supplied no authority for *not* including as income the payments she received in lieu of health-and-welfare benefits, the AJ applied similar reasoning to conclude that those payments should count as income for purposes of determining Ms. Green's earning capacity under the FERS regulation. *See* SApp'x 9–10. Separately, the AJ determined that Ms. Green failed to show entitlement to a waiver from the government's recovery of the overpayments she received and that the record did not support adjusting the overpayment repayment schedule.

The AJ's initial decision became the Board's final decision. *See* 5 C.F.R. § 1201.113. Ms. Green timely petitioned for review of that decision. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## II

### A

Our review of Board decisions is limited. *See* 5 U.S.C. § 7703(c). We review a decision for whether it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Id.*; *see also Grover v. Office of Pers. Mgmt.*, 828 F.3d 1378, 1382 (Fed. Cir. 2016). Substantial evidence is "such relevant evidence as a reasonable individual might accept as adequate to support a conclusion." *Belanger v. Office of Pers. Mgmt.*, 1 F.3d 1223, 1227 (Fed. Cir. 1993).

Ms. Green challenges the Board's decision to include as income the health-and-welfare benefit payments she received from her employer for purposes of determining her earning capacity. *See, e.g.*, Petitioner's Informal Br. 4. We also construe her opening brief as challenging the Board's determination that she was entitled neither to a waiver from the government's recovery of overpayments, nor to an adjustment of the overpayment repayment schedule. *See id.* at 4–5, 20. We address these issues in turn.

B

The operative OPM regulation provides, in a subsection titled "Income," that "[e]arning capacity for the purposes of this section is demonstrated by an annuitant's ability to earn post-retirement income in exchange for personal services or a work product." 5 C.F.R. § 844.402. OPM interpreted this regulation to include as income the health-and-welfare benefit payments Ms. Green received from her employer. "As a general rule, we must defer to an agency's interpretations of the regulations it promulgates, as long as the regulation is ambiguous and the agency's interpretation is neither plainly erroneous nor inconsistent with the regulation." *Gose v. U.S. Postal Serv.*, 451 F.3d 831, 836 (Fed. Cir. 2006). We therefore consider whether the regulation is ambiguous on the particular issue here— whether these health-and-welfare benefit payments qualify as income for purposes of determining earning capacity—and, if it is ambiguous, whether OPM's interpretation to include such payments as income is plainly erroneous or inconsistent with the regulation.

The Board found that the text of 5 C.F.R. § 844.402 does not, by itself, resolve the issue of whether these health-and-welfare benefit payments qualify as "income in exchange for personal services or work product" for purposes of determining earning capacity. *See* SApp'x 7–9. We likewise conclude that, although the regulation clarifies some aspects of what qualifies as income for purposes of

determining earning capacity, *see* 5 C.F.R. § 844.402(c)(1)–(3), the regulation's text alone does not resolve the specific question of whether these health-and-welfare benefit payments so qualify.

Having concluded that the regulation is ambiguous on this point, we next consider whether OPM's interpretation of the regulation to include these health-and-welfare benefit payments as income is plainly erroneous or inconsistent with the regulation. *See Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 207–08 (2011) (after finding the regulation ambiguous on the question presented, looking to the agency's interpretation of its own regulation for guidance and deferring to that interpretation unless plainly erroneous or inconsistent with the regulation). We cannot say that it is.

As the Board observed, the analogous CSRS disability-annuity provision supports this interpretation. In that context, although medical benefits are generally excluded from earning-capacity income, they are *not* excluded where the employee has an opportunity to receive the cash value of those benefits. *See* SApp'x 7–8 (discussing 5 C.F.R. § 831.1209(d)(3)–(4)). Similarly, OPM notes that while it does not include an employee's health insurance benefits in calculating "income" for purposes of determining earning capacity, it *does* do so when those benefits are converted to payments from the employer to the employee, as they were here. *See* Respondent's Informal Br. 9. Ms. Green has not demonstrated—nor can we conclude—that treating these cash payments as income for purposes of determining earning capacity is plainly erroneous or inconsistent with the regulation. *See Gose*, 451 F.3d at 837 (explaining that we defer to an agency's interpretations of its own regulations "because the agency, as the promulgator of the regulation, is particularly well suited to speak to its original intent in adopting the regulation").

## C

The Board next considered whether Ms. Green was entitled to a waiver from the government's recovery of the overpayments she received.[4] SApp'x10–13. The Board observed that recovery "will be waived when the annuitant is without fault and recovery would be against equity and good conscience." SApp'x 10 (citing 5 U.S.C. § 8470(b)). But, as the Board correctly noted, it was Ms. Green's burden to establish her entitlement to a waiver by substantial evidence. SApp'x 11 (citing 5 C.F.R. § 845.307).

The Board found that, although Ms. Green was not at fault for creating the overpayment, she had "failed to provide evidence that recovery would be against equity and good conscience." SApp'x 12. The Board considered Ms. Green's evidence concerning her mortgage and take-home pay but found no reason to find that OPM's proposed repayment schedule would constitute a financial hardship. SApp'x 12–13. The Board similarly found no evidence upon which it could assess whether Ms. Green was entitled to an adjustment in the repayment schedule. SApp'x 13. On review, Ms. Green has not demonstrated that the Board's waiver and adjustment decisions lacked substantial evidence or were otherwise arbitrary and capricious.

## III

We have considered Ms. Green's remaining arguments but find them unpersuasive. For the foregoing reasons, we affirm the Board's decision.

**AFFIRMED**

---

[4]   The Board found that OPM showed by preponderant evidence that Ms. Green did, in fact, receive overpayments following the date her disability annuities should have terminated. SApp'x 10.

## COSTS

The parties shall bear their own costs.